Good morning, Your Honors. James Chavez of Federal Defenders. I am here on behalf of my two clients, Mr. Barajas-Alvarado and Mr. López Garcia. It was nearly 25 years ago that the Supreme Court in Mendoza-López held that our case has established that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceedings. At today's hearing, there are two reasons that I'm asking this Court to vacate the convictions for my client, and that is because the removals in this case should not be allowed to serve as a predicate for a 1326 prosecution. The first one is because of the fundamental flaws in these expedited removal proceedings as both designed and implemented, that there's never going to be any meaningful review. That is an issue you can't bring up to us, however. I'm sorry, Your Honor. That is an issue which is systemic, and you cannot bring to us, but rather must bring in the District Court for the District of Columbia. Isn't that right? Your Honor, that part of the provision was for a expired, I think, two or three months after the implementation of these regulations. And the argument that I'm making here is not that the expedited removals cannot be used for immigration purposes, but instead that these expedited removals cannot be subsequently used in a criminal conviction. Why not, if there is an opportunity for some meaningful review afforded? There is no review for... There may or may not have been in this case. My question is, if there is an opportunity for some meaningful review, then why in the world wouldn't they be usable? Your Honor, I mean, the statute, as it's written, allows for no administrative or judicial review. But we said that we can't follow that. So just like in Lopez-Vasquez, the Fifth Circuit said, we'll take a peek at the ERO proceeding. If we followed the Fifth Circuit's lead in that, why wouldn't that meet Mendoza-Lopez's requirements? So you're asking why there was a due process violation and why there was prejudice? Why couldn't we resolve the case? I know you want us to resolve the case by saying you can't use EROs as predicates. Yes. But why couldn't we equally resolve the case by saying, notwithstanding 1225bd1, we need to take a look at whether the ERO proceeding gave the alien what he was due under the statute. Having determined that it did, then it can be used as a predicate. Why isn't that an equally satisfying resolution? Well, if the Court does want to go that direction, I think that we very easily do establish prejudice in this case. And I know the previous – the Court was very concerned about how is there prejudice in this case. Let's take one step at a time. Okay. Yes, Your Honor. Do you agree that we can look at the – look at the – if we follow Lopez-Vazquez and look at the – whether the proceeding complied with the statute, then we have no problem with Mendoza-Lopez? Your Honor, admittedly, the arguments are – I know I didn't answer yes or no to your question, but the arguments in my briefs are somewhat contradictory in that the first one I'm arguing, no, the Court can't. And then in the second and third arguments, I'm saying, well, if the Court is going to, then this is what happens. So I'm submitting my argument on the briefs on the first issue. So assuming that the Court does read – If they're contradictory, which one are we supposed to pick? Your Honor, I mean, every other judge who has addressed this issue has gone and looked at the merits of the removal proceeding. And so I thought it best to present both arguments on behalf of my client. Let me come at this from a wholly different approach. If due process has been violated in the 1326 prosecution, it was violated because we are using the fact of the subsequent reentry as a predicate for the criminal conviction that is now going to result in a felony conviction. And it is a fundamental tenet of due process that a defendant must have notice that he was not permitted to reenter the United States in order to fairly say that he had warning that if he came back, he would be prosecuted for the illegal reentry. I don't see any evidence in this record that suggests to me that your client didn't know that he couldn't come back after he was removed in these expedited removal proceedings. The forms clearly warn him that he should not come back. And I haven't advanced that argument. I understand that. But you're asking us to find a constitutional due process violation. And you're hitching your argument to a very technical challenge to the manner in which expedited removal proceedings are carried out, saying that if the government can't show that all the I's and the T's were dotted and crossed, then we can't consider the fact that he was removed. But isn't the real question here whether or not he knew he couldn't come back? And that's essentially what the government shows when they show that he has previously been removed. And now we're going to prosecute him and tag him with a criminal conviction because he had the audacity to come back when he knew he shouldn't return. Okay. I guess I would strongly disagree with Your Honor because not every time somebody is captured at the border and sent back to whatever country they come from is there an order of removal against them. We only get to 1326 prosecution when somebody has been actually ordered removed. And that is a small minority of people who are actually caught in the country illegally and sent abroad. Are you saying that even in expedited removal proceedings, the alien is not told when he is ordered removed at the conclusion of the expedited proceeding that you are not to return? No. I'm not saying that at all. Okay. But I am saying that the other thing that the court said is that he was due process offended by using the result of that prior proceeding when he was told don't come back. Okay. Well, I mean. That's an element. I mean, the language that, the language, I mean, what I'm relying on is Mendoza-Lopez. And in Mendoza-Lopez, the Supreme Court expressed real reservations about letting the outcomes of a prior removal proceeding establish an element of offense. Mendoza-Lopez dealing with a classic deportation proceeding. It was. As opposed to an expedited proceeding. And hasn't immigration law always recognized a distinction between excludable aliens and inadmissible aliens? Yes, Your Honor. Okay. Here we are dealing with the class of excludable aliens, not the class that we were dealing with in Mendoza-Lopez. I mean, Mendoza-Lopez was pre-Ira-Ira, pre-EDPA. Excludable aliens no longer exist. But there's still a distinction, is there not, counsel, between what the government can do at the border, as they have done with your client, for a person who is trying to come in versus what we do after we catch somebody in the United States who may have been here for 20 years. I mean, that issue has not been fully resolved by the courts. But there's a distinction in terms of what process is due the alien, depending on the nature of the proceedings, is there not? Again, I said there is some case law pre-Ira-Ira, pre-EDPA, and the case law subsequent to that has not been fully developed. And I think what's important to notice is that these types of proceedings are applied not only at the border, but they're being expanded to be used within the boundaries of the United States. Let's talk about the two cases that we're looking at today involve people at the border knocking on the door with false identities. Yes. Trying to sneak in. Yes. So let's confine the argument to what we do now. The court referred to some sort of technical violations. The violations in this case were that the proceedings were not translated to my clients. There's a question about that, is there not? At least in one of them where the form itself, both boxes are checked, and then there's a signature by the interpreter saying, I did translate the proceedings. And it's not the interpreter. It's the same removal agent in that case. Maybe he was bilingual. There's nothing in the record to suggest that. But he signed on the line that said interpreter, didn't he? But below, I mean, there's a special section at the bottom of the forms for where they're supposed to indicate whether or not an interpreter was used. And in all three of these, all three of these, there is in two of them that there's some indication that they weren't translated. If it wasn't translated, how would that have made a difference? Did he establish it was plausible that he had been permitted to withdraw? And I would like to, yes. Yes, Your Honor. It is absolutely plausible that withdrawal of removal would have been granted to these individuals. And the statistics that I state in my briefs really make that clear. 70 to 90 percent of people each year are granted withdrawal of removal. But doesn't Corrales-Beltran say we can't rely on those sorts of statistics? We have to look at the individual case? Well, if Your Honor does want to look at the individual case, then the court can look at Valadez-Munoz 623F3-1304, which I cited in a 28-J letter that I apologize for just submitting this week to the court. But in that case, it was yesterday. Yes, Your Honor. I apologize for that. But it does provide a concrete example of an individual who snuck into the United States, used a birth certificate that was not theirs, got a driver's license under that name, left the country, tried to reenter the country with this birth certificate that wasn't theirs, with this fraudulent driver's license. And in that case, the agency allowed him to withdraw his application for removal. And there's another example that I cited in my 28-J letter where an individual is found to have violated or is found to have lied to the immigration officers when she entered the country. Wait, wait. In Valadez-Munoz, the alien had lived in the U.S. for 10 years and left the country to take his U.S. citizen fiancé to meet his family. And the court said it's discretionary. It doesn't have to be granted. So you have an example, but the case isn't directly on point. Very different equities. How does that help you? Well, I mean, it helps me to show, I mean, because Judge Solomon was saying, oh, you know, this individual presented, you know, fake documents. How is anybody ever going to, how is the agency ever going to allow somebody to do that? Well, in fact, this court has documented the agency doing that. And if you look at the government's own statistics published by the Department of Homeland Security, they do it in 70% to 80% to 90% of cases. And who, and I guess it's important to think who is being put through these expedited removal procedures. It's two classes of aliens, either people who enter without inspection or people who use fraudulent documents. So nobody is free of sin who is subject to these types of proceedings. Either they're sneaking in without us looking or they're trying to sneak in right underneath our nose. And what we know is that they are being given withdrawal the vast majority of the time. The problem with the position that you're asking us to adopt is if you look at the statistics and even accepting the truth of what you just said, there are nearly a half a million expedited removal proceedings in the United States on an annual basis. And you want us to declare that the results of none of them can be used in a subsequent 1326 prosecution. That is my first argument today. But the second argument is if you're going to do the analysis, if you're going to ask whether or not there's prejudice, is it plausible? Absolutely. So would your alternative, because I really care about what the results of our rulings will be, and I want to understand what the ramifications of adopting your position will be. Is it your position then that there can be no expedited removal proceedings, that if the government wants to make good on its notification each time a person is either denied entry or removed, that you cannot enter and if you do we will prosecute you, that they have to go through a full removal proceeding before an immigration judge and a tenant with all of the years of delay and appeals to the BIA and to us? Is that your position? No, Your Honor, because there are other alternatives. There's the stipulated removal process. If the court looks at United States v. Romulus v. George Ward law opinion from last year, that's another way where an individual doesn't get to see an immigration judge. There is administrative removal for aggravated felonies. There are other options that the U.S. government does have that are brief but do have more due process protections than in this case. But why is it under the existing case law, couldn't Congress, if it wished, do away with all of these proceedings completely and simply give border protection officers the right to simply refuse entry without any kind of proceedings at all? Just no, we're not letting you in. I mean, and that's what happens in the vast majority of cases. In the vast majority of cases, people are caught at the border and immediately turned around. Turned around. And there's no order of removal. And your position is that by creating a procedure through these regulations, that gives rise to a constitutionally recognized due process right. I mean, what the Supreme Court said in Mendoza-Lopez is when you're going to use the outcome of an administrative proceeding, there must be collateral review. But if the, say that Congress had enacted a statute, as Judge Tolman was saying, that says the AG, the Attorney General may expeditiously remove aliens in his own or her own discretion with no procedural protections, with no constraints on that discretion, which Congress would have the power to do. Yes. Then the Mendoza-Lopez review of the return over the border of the reentry, no review is possible, or there's no meaningful review possible, because it's purely discretionary. There's nothing to review. And if there's no meaningful review, then that type of proceeding shouldn't be allowed to establish the element of an offense. And that's exactly right. Well, Mendoza-Lopez doesn't say that. Mendoza-Lopez says you have to, if you're using an administrative decision as a predicate, you have to give it a meaningful review. But if there's no meaningful review possible, it doesn't say you can't use it. But it does leave open the possibility. And let me read two from the case to the Court. At 481 U.S. 838 Note 5, the Court says, quote, the propriety of using an administrative ruling in such a way remains open to question. And up above, it says the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling. And this Court has interpreted this language in the United States v. Villafibella to say that the Court has, quote, hinted that in some circumstances it would, quote, be per se impermissible to base a criminal conviction on a prior administrative ruling. And so I think in the hypothetical that Your Honor is suggesting, that falls into that situation that Mendoza-Lopez anticipated. And I would like to save a few minutes of my time for rebuttals. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. Mark Rahey for the United States. One thing I'd like to point out, Judge Tolman just asked the defense counsel, well, if we accept what you say, doesn't this mean that expedited removals can never be used as the predicate for a criminal 1326 prosecution? I believe the defense sidestepped that answer. No, I thought I heard him say that's right. Well, I thought I heard him say, well, they have stimulated removals, all these other things, as long as we're on the same page. No, I think his answer to my question was, yes, Judge Tolman, that is correct, that my first position is that these results of these expedited removal proceedings can never be used in a subsequent 1326 prosecution. Good, because the government just wants to be clear about that, because that is clear to me. I mean, I'll give Mr. Chavez the opportunity to disabuse me of what I thought I heard, but that's what I heard. Because that would be a remarkable result. And obviously, from the language of 1225b1d, Congress intended for expedited removals to be elements in subsequent 1325 or 1326 convictions. Otherwise, they wouldn't have had that prefatory language to that clause. Well, then why under Mendoza-Lopez don't we have to look at whether, at a minimum, the alien got what Congress authorized or set forth in the statute? Well, I think it goes to something that's already been brought up by both of your honors. This is a very narrow context. This is a very special kind of case, expedited removal. It applies only to arriving aliens. And the law is clear. It goes back decades from both the Supreme Court and this Court that aliens standing at the threshold of the border stand on a different footing than people who are already here. So Congress doesn't have to give them anything at all. Correct. But having given them something, I don't see a basis for saying they're not entitled to that. In fact, in Shaughnessy, the Court says what Congress allows is what the alien gets. Exactly. And I sometimes struggle with that, too. But the odd thing is, how can in one breath we say that there's no constitutional right to something? And then suddenly, they're basically given procedures charitably, statutory or regulatory, and then suddenly those things are treated the same in magnitudes of the Constitution. Well, we do that in a lot of contexts, right, where the State doesn't have to provide for procedures for firing, but if they do, then you're entitled to them. So I don't think we can argue that the greater includes the lesser sort of thing. I mean, Congress has set out some procedures, however minimal. Uh-oh. What did I just hit? It's the volume, the master volume. Yeah. There we go. Okay. Good. I'll give you an extra minute. I appreciate that. Judge Acuda, I would come right back and say, well, here, what Congress has said is you get no review, collateral review. So that's the procedure that's at issue here. And this doesn't apply to stipulated removals, reinstatements, admin. This is only for a narrow class of aliens. So Congress says you get these procedures, but no judicial review. Correct. Mendoza-Lopez says you have to have judicial review of the procedures. Now, do you have another case where Congress says no judicial review, that is part of the procedure that prevents courts from judicially reviewing it? I mean, I just can't think of a case. I can't either, Your Honor. So the Supreme Court says judicial review, and when Congress says no you can't, if the Supreme Court says you must, then we just ignore Congress, right? If it gets to that point, and I only want to take another minute to try to defend this, because, again, the fact that this is unique I think should almost give comfort. It shows that Congress isn't willy-nilly disregarding Mendoza-Lopez. I mean, Mendoza-Lopez comes out in 88. This statute's passed in 97. Congress must have had a reason. And I will submit a 28-J letter. Legislative history is always hard to parse through, but I found a House conference report from the 104th Congress which cites Rafiti, which is a District of Columbia Circuit Court appellate case, which cites one of the Hennessy or the Shaughnessy case, I'm sorry, where Congress basically, and this is House Report 104-383, they're talking about expedited removal. They say the provision recognizes that there is an obvious and fundamental difference between aliens who entered the United States lawfully and later become deportable and those whose initial entry was wholly illegal. And then they go on to talk about when they quote Rafiti, which is at 880 F. 2nd, at page 520. And, again, this is somewhat, you know, when a legislative history actually cites case law, I think that says something. Here they say, our starting point, therefore, is that an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States. Right. And so they could have just said, Attorney General, use your discretion. They're entitled to no procedure. And the Supreme Court has said Congress can do that for arriving aliens. But having created a procedure, what are we to do with that, given Mendoza-Lopez? Can we say, even though Congress has created a procedure, we are precluded from determining whether you got it or not? Is there any precedent for that? Well, I believe it's in this narrow circumstances you have to read from Mendoza-Lopez. What was in front of Mendoza-Lopez? It was aliens who were arrested in Lincoln, Nebraska, who were put in deportability or, you know, deportation proceedings where the government conceded due process violation. And what Mendoza-Lopez, I believe we quote these excerpts in our brief, we've constantly referred to the right when an alien is deprived of the right to judicial review in the administrative context, they deserve later review. Well, that presupposes the existence of a right of review. Our point simply is, if based on Landon versus Placentia, Zadivas versus Davis, all the case law for 40 years that said arriving aliens at the threshold have no rights, then they can be read together. So we have a lot of case law in which arriving aliens have gone through a removal hearing, they appeal to the BIA, and then it comes up to us. And should we say, we're not going to listen to this case because you're an arriving alien, you don't have any right to any particular procedure? I wouldn't say in those situations because, again, 1225b1d only applies to this procedure that's before the court in these two cases. But the court, but Congress could then say you can't review it. I think we've, didn't we already go through that round? And then we got 1252d. So, you know, I'm not sure there's any precedent or basis for the suggestion that once Congress has created a procedure, then Congress can preclude us from determining whether it was followed. In 30 seconds, I will direct my attention to that. The last thing I would say, because you asked, Your Honor, a few minutes ago, you know, assuming we find trouble, can't we just ignore it? Can we do what the Fifth Circuit did in Lopez-Vazquez? I'd say absolutely. There's a severability provision in 1225b. It follows in the historical statutory notes. It expressly states that if any provision is found unconstitutional, the remainder shall not be affected. 1225b1d textually and analytically stands alone. It can be dropped out, and under traditional severability analysis, this Court has a duty to give effect to the remaining provisions. We know that Congress, as I said at the beginning of my presentation, intended for these expedited removals to be elements of 1326 cases. So you have a clear intent of Congress that that be the case. You have an express severability clause so that in the end, notwithstanding 1225b1d, we can subject this to the normal review. And by normal, I mean, you know, the years of jurisprudence that this Court has. It's always about these two, what I call the two Roman numerals. First, you have to establish the two-crosses violation, and then you have to establish prejudice. And that's the Ubaldo-Figueroa standard, which is often cited. In this case, to go to prejudice, where a lot of the discussion has been already, the government's position is that there are no plausible grounds. And that has always been the standard. What about this case that opposing counsel cites, Villadas-Munoz? These are the ones from the 28J letter from yesterday. Right. What I would say to that, Your Honor, all that shows, at best, is that it's possible. The test here isn't whether it's possible. It's whether it's plausible. If it's near possibility, because I'm going to take those two cases where the propriety of the withdrawal of application was not squarely before the Court, so it wasn't litigated. We don't know if those inspectors even acted appropriately under their own procedures, let alone those aliens might have been able to show factors relating to admissibility. None of that's before us because the issue wasn't in front of us. Even taking those two cases, all it shows is that there are two aliens out there that have been able to get this relief before while committing acts of fraud. That's not enough, because if it's simply enough to point to the near possibility that relief can be given, we wouldn't need the last 30 or 40 cases from this Court talking about plausible grounds to relief. How could the aliens show that it was plausible? I think there are a couple of different ways. What evidence would cause that to? Well, you know, in looking at the evidence, it seems to be that there is, first of all, this standard. It predated IRERA. It goes back to the matter of Gutierrez. The ability to show factors relevant to admissibility. And that's also in the 1240.1d regulation. It shows up throughout the case law. We cited various district court cases. I think some even from our own southern district. And I believe your Honor, Judge Ikuda, asked what that means. There's not much law out there. I have a feeling what it means by its own plain language is they have to be able to show that, you know, setting aside what happened on this day when they were turned away from the border, do they have other petitions pending? Maybe they actually have a right to come in. They just forgot to bring their ID that day. I honestly don't know. Well, it's maybe not a beauty, but from the government's perspective it is. When we talk about prejudice, the burden of proof is on the defense. So if somebody has to answer that question, it has to be him. But what I would tell you is they haven't proffered any factors in either of the two cases before your Honors where factors relevant to admissibility establish any kind of plausibility. Yes, they can file a 28J letter from Texas and wherever these other two cases happen, but there's no similarity of facts and there's no analysis in those cases. Now, aside from this threshold or this standard of factors relevant to admissibility, I know that the defense in these two cases, they argue to an inspector's field manual where they talk about actually at the border, inspectors may have a little more discretion and they list six non-inclusive factors. Again, I would point out at no point does the defense, except going to, you know, the very last one of those factors talks about any other equitable or humane consideration. That would be the one that would seem to include are you married, do you have kids. That seems to be the only thing that the defense hangs their hat on, because they leave out the fact that in both of these cases, it wasn't the kind of situation where they didn't have the documents. There's affirmative fraud. There's oral false claim to United States citizenship. There's presentation of counterfeit visa. And there's presentation of a false birth certificate. One of the first factors under that inspector's field manual says the seriousness of the immigration violation. Well, that's high in this case because there's affirmative fraud. The next factor is previous findings of inadmissibility against the alien. I don't believe that applies to either of these ones, these aliens. Three, intent on the part of the alien to violate the law. Again, because there's affirmative fraud and presentation of false documents, that would militate in favor of the government's position. Number four says ability to easily overcome the ground of inadmissibility, i.e., lack of documents. This factor to me sounds like factors relating to admissibility. Are there other petitions? Are there other avenues by which these aliens could gain status? Again, in this case, there's no proffer. There's never been any evidence as to either Mr. Lopez Garcia or Barajas Alvarado having any such other factors available. And two factors left. Five says age or poor health of the alien. There's no allegation that either of these individuals were in poor health, and I would indicate that they were in their 30s at the time of the expedited removal, so it's not as if they were tender age or advanced age. And again, finally, is the number six factor under this manual cited by the defense, other humanitarian or public interest considerations. And that's where they say, hey, he's got a cohabiting relationship, two children. The government would submit, if that's the only factor or there may be another one that weighs in favor of plausibility here, that's not enough, Your Honor. Plausibility means there has to be some kind of likelihood. That doesn't distinguish this defendant in any meaningful way from a lot of aliens who apply or who come to the border who have families and kids. If anything, it discriminates against single aliens who won't have those equities. So if I understand the argument, the argument is that the majority of people who ask for withdrawal are granted withdrawal. Why doesn't that make it plausible? I'm glad you brought that up, Your Honor. And you cited Corrales-Beltran. That's interesting. That, I believe, is from the 212C context where defense frequently would cite a statistic 51.5 percent of 212C applications were granted when 212C was in existence. So therefore, that makes my case plausible. Well, there's a reason why I don't believe that statistical argument carries much weight, Your Honor, and it's underlies Corrales-Beltran. Not only do we not — not only is it not tied to the specific circumstances of this case, more importantly, it doesn't break down. I've looked up the statistics that the defense has cited to. The PDF citation in the 28J wouldn't work at the hotel computer where I was yesterday. But all it says is here are X number of thousands of people who got withdrawal. Here's X number of thousands of people who got expedited removal. Of the ones who got withdrawal, it doesn't break it down into these ones had affirmative fraud, as opposed to maybe they were the ones who just simply didn't have the documents. And I think that's important. If it turns out, consistent with what intuitive response would be that, hey, you just came to our border. You're trying to snipe in by lying. Now we're going to just act as if this didn't happen and give you a free pass. They need to break down the statistics to say, hey, people with fraud actually get it a lot. And my guess is they're not going to be able to do that. And actually they haven't, even though it's their burden. And again, it just doesn't jibe with any kind of public policy. And the final thing I would point out, Your Honor, to use defense's evidence against them, again, that Inspector's Field Manual, Section 17.2a, I talked about those six enumerated factors. They're listed in the defendant's briefing. At the end, after those factors, there's a part that's left out in the defense's briefing. What does it say? It's one sentence. An expedited removal order should ordinarily be issued rather than permitting withdrawal in situations where there is obvious, deliberate fraud on the part of the applicant. For example, where counterfeit or fraudulent documents are involved, an expedited removal order is normally the appropriate response. If anything, that tells you that there's a presumption of expedited removal in cases of fraud. Here, then, it would be incumbent on the defense, not only because it's their burden of proof as to prejudice, but in light of this direct advice to inspectors at the court, he needs to show something extraordinary unusual, and he hasn't done so. And if he comes back with, again, I think it's a common defense theme in these 1326d cases, well, look, it's possible. I just cited you two cases where people in Texas and San Francisco were able to get it. Therefore, it's possible for me. The reason I said five minutes ago possibility isn't the earmark, it's plausibility. If possibility were the earmark, we wouldn't even be up here arguing this. Why? Because every single relief from removal is discretionary. By definition, whether it's 212C, 212H, cancellation of removal, suspension of deportation, if merely possibility of relief were enough to show prejudice, then that would be the end of the story. But it's not. It's plausibility. There has to be some showing of likelihood. You can't just say it's theoretically possible. You have to be able to come to this Court and say, these are my facts. This is how it jives with the law. And what does the law tell us? You have to normally show factors relevant to admissibility to get withdrawal of application. There's been no effort of that here. And then this inspector's field manual lists six factors, four of which are clearly against the defendant, plus an instruction that ordinarily the presumptive result is expedited removal in cases of fraud. There's no dispute that fraud is what occurred in these cases. And I see I have two-and-a-half minutes left, but unless the Court has any further questions, the government would submit. Roberts. Oh, no, thank you. All right. Thank you very much, Ms. Brady. Mr. Chavez, I think you have about three minutes left. A few points here. The first is that the government counsel tries to make a difference between the word plausible and possible. And just to make clear, my clients only need to show that it was plausible. And this Court has made clear that that standard is not probable, right? All there has to be is a plausible avenue. But even if we give a very generous Webster's definition to plausible, how do you meet that line out of the immigration inspector's manual that Mr. Rahe just read to us? Well, one, I've shown concrete examples of where that's in this Court's cases. Well, the fact that it's happened means that it is theoretically possible. I'll grant you that, but the test is plausible. And two, looking at the numbers, the Court can't deny the numbers that the vast majority But as he points out, we don't know what the underlying facts were in those cases. We don't know if every single one of those withdrawals involved clients like yours who had attempted to enter by fraud. Well, in fact, we know that they don't because we have a case that said that not all of them do. Okay, so you've got one out of, what, I don't know what the number is, 37,000? And that's why I think it's important to think who is subject to these removal proceedings, people who misuse documents and people who sneak into the country. So you're necessarily talking about a population of people that are already violating the law. Well, I mean, it could also include people who left their green cards at home and went to visit their family in Mexico, and now they get jammed up at the border, and so they have to maybe go back and stay in Mexico for a while while their green card is shipped to them. I don't know. These types of removal proceedings aren't applicable to the rest of the people. Are you saying that as a practical matter, or are you saying that there's some statutory limitation to persons who are, can you point us to that language? Yes. So these types of removals are only applicable to people who are inadmissible under 8 U.S.C. 1182A6C and 1182A7. And the other point that I'd like to make is that Madre Gutierrez, the limited number of factors that are to be considered in Madre Gutierrez, that doesn't apply here. What we're talking about is an immigration inspector deciding a sort of a broader balance of the equities, circumstances, whether this person should be granted withdrawal or removal. And if you look at my clients, Mr. Lopez Garcia, when he was ordered removal, had no contacts with immigration history, had no contacts with immigration officials. He had no criminal convictions when he was ordered removed from this country. And I think that that's really important to keep in mind, especially since the record demonstrates, and if you look at the PSR, if you look at the sentencing letters, he had children here in the United States. He has a wife here in the United States. Both of my clients had children here in the United States. Both of them, the majority of their family lived here. And so there were real incentives for them to want to withdraw their application. And they were really serious. That five-year bar with the order of removal was significant in their cases. And unless the Court has any questions, I will submit. Thank you very much. Thank you. Thank you both. That was very helpful. And we'll get you an answer as soon as we can. Thanks. Thank you. We'll be adjourned for the week.  Thank you. Thank you.
judges: Rymer, Tallman, Ikuta, Cjj